IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| ELLA R. HALL, | ) Civil Action No.  3:10-2054-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| STACY BRANHAM, AND | ) |
| KERSHAW HEALTH MEDICAL CENTER, | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

     Plaintiff, Ella R. Hall ("Hall"), filed this action on August 6, 2010.  She alleges claims under

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the

Age Discrimination in Employment Act of 1967, as amended, 26 U.S.C. § 621 et seq. ("ADEA");

and the South Carolina Human Affairs Law ("SCHAL"), S.C. Code Ann. § 1-13-10 et seq.[1]

Defendants, Stacy Branham ("Branham") and KershawHealth (incorrectly identified as Kershaw

Health Medical Center), filed a motion to dismiss and for summary judgment on June 10, 2011.  Hall

filed a response on June 27, 2011, and Defendants filed a reply on July 8, 2011.

## **FACTS**

1.     Hall is a fifty-five year old, African-American, female nurse.  See Plaintiff's Deposition ("P.

     Dep.") 10; Complaint, Para. 4.

2.     Hall has been employed with KershawHealth (previously known as Kershaw County Medical

     Center) since 1999 in KershawHealth's comprehensive acute care hospital facility in

———————————————————

[1]Pretrial matters in this case were referred to the undersigned pursuant to Local Civil Rule 73.02(B)(2)(g) DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

Camden, South Carolina.  She has worked in the KershawHealth's Medical II Unit ("Med II"), where patients are admitted for inpatient medical services.  P. Dep. 22, 35, 38.

3. In 2000, Hall requested to be placed on KershawHealth's Baylor Plan, which KershawHealth granted.  P. Dep. 42; Defendants' Exhibit ("D. Ex.") 7, 8.  Baylor, which is common across the nursing profession, is a plan for encouraging or enticing nurses to work weekend shifts by providing a financial incentive.  P. Dep. 51-52.  Under KershawHealth's Baylor plan, a nurse works for the hospital every weekend during the year, except for three weekends (six days).  Id. 52; D. Ex. 11.  A nurse on the plan works for twenty-four hours (or two twelve-hour shifts) and gets paid for thirty-two hours.  P. Dep. 51; D. Ex. 11.  It is critical that a nurse on the Baylor plan be able to work weekends, as that is the whole point of the plan.  P. Dep. 52.

4. Hall worked on the Baylor schedule from 2000 until September 2007.  P. Dep. 41-42, 58; D. Ex. 13.

5. In 2007, Hall and her husband took a thirty-day trip around the United States on their way to Oregon.  P. Dep. 12-13.  Hall's husband had decided to move to Oregon, and he and Hall would have stayed there if things were as they had expected. P. Dep. 153-154.  During the time Hall traveled to or in Oregon, she was on the weekend schedule.  P. Dep. 154.

6. KershawHealth's leave of absence tracking log recorded that Hall called regarding being absent on August 30, 2007 and subsequent days (with an actual return date of September 22, 2007) and the following messages: "emergency out of town-take off schedule this weekend and next.  Will call later to update status later. (Baylor)[.]  Called 9/13 said she could not work this weekend either."  P. Dep. 54-57; D. Ex. 12.

2

7.    Under KershawHealth's policies, "Baylor staff may receive six scheduled days off per year by submitting vacation request and approval...." P. Dep.; D. Ex. 11.  There is no record that Hall submitted and obtained approval to be away for multiple consecutive weeks.  Further, she would have missed more than six scheduled days off, given that she was away from KershawHealth for about thirty days.  See P. Dep. 12-13, 57.  Hall was removed from the Baylor position.  P. Dep. 153; Branham Dep. 58-59.

8.    In September 2007, immediately after Hall's absences, KershawHealth transferred Hall from the Baylor schedule to a full-time staff nurse position.  P. Dep. 57-59; D. Ex. 13.  Her hourly rate did not decrease and she was given thirty-two hours per week, allowing her to earn the same or greater salary as she was earning on the Baylor schedule.  P. Dep. 47-48, 59; D. Ex. 13.  Hall has held a staff nurse position since September 2007.[2]  P. Dep. 59.

9.    On the Med II unit, the nurse manager serves as Hall's immediate supervisor.  P. Dep. 48-49.  From 2007 until December 2009, Defendant Branham, a white female, was the nurse manager over Hall.  Hall stated that the nurse manager is supervised by the Director of Inpatient Nursing, Stacy Collier ("Collier"), who reported to Gloria Keefe ("Keefe"), the Vice President of Nursing Services, who, in turn, reported to Donnie Weeks, the President and C.E.O. of KershawHealth.  P. Dep. 49-50.

10.   The task of assigning patients and admissions to staff nurses is carried out by charge nurses, who work on every shift.  P. Dep. 73-74.  Charge nurses on Med II have included both African American and white nurses.  Pl. Dep. 77-81.  The charge nurse on the night shift

---

[2]Hall returned to South Carolina, as Oregon was not what she and her husband expected.  See P. Dep. 13.

3

makes out the schedule for the day shift, the day shift charge nurse may change the schedule, and the day shift charge nurse adds newly admitted patients as they come in during the day. P. Dep. 91.

11. Hall worked day shifts at KershawHealth, usually a few days per week.  P. Dep. 60.

12. Branham never served as charge nurse in relation to Hall, and, as nurse manager, Branham never assigned patients to Hall.  P. Dep. 81.

13. There are twenty-four private rooms on Med II, with one bed per room.  P. Dep. 82. Generally four or five nurses plus the charge nurse work on the unit during each shift.  P. Dep. 70-71.  Hall's principal responsibility is to attend to her assigned patients, she may or may not see any other patients on the floor.  P. Dep. 69.  She reviews the charts of her patients, but not those assigned to other nurses.  P. Dep. 68.  She learns the condition of some patients not assigned to her during "report," when nurses from the prior shift summarize patient information.  P. Dep. 69-70.  Hall, however, "may or may not be there for the full report."  Hall does not know about the "acuity"[3] of patients reported on after she has left the report meeting.  P. Dep. 70.

14. Hall believes the night charge nurses assign her some of the worst patients.  P. Dep. 66.  She also believes she is assigned more patients than other nurses.  P. Dep. 66; D. Ex. 1.

---

[3]The parties do not define "acuity."  This term appears to refer to the difficulty, level of illness, and/or workload needed to care for a patient.  Thus, a high acuity patient needs more care and would be more work or would require more time for a nurse to care for than a lower acuity patient. See, e.g., P. Dep. 66 (discussing patients assigned to Hall)

15.     On three occasions Hall communicated with Branham about her work conditions. P. Dep. 137-138. In April or May 2009, Hall spoke with Branham and said that she had at least ten patients and that they needed to "share the wealth around here." P. Dep. 137-138.

16.     On August 13, 2009, Hall emailed Branham complaining about an incident in which a line came out of the vein of one of her patients. In the email, Hall briefly referred to charge nurses giving her patient loads as high as ten patients a shift. Hall did not mention age or race discrimination. P. Dep. 138-139; D. Ex. 20, p. 000249.

17.     Branham offered to meet with Hall one-on-one. Hall declined the offer, stating she would only meet with Branham if the Director of Inpatient Nursing, the Vice President of Nursing Services, and the Present and C.E.O. of KershawHealth also participated. P. Dep., D. Ex. 20, p. 000248.

18.     Later the same day, Hall sent Branham another email in which she claimed that "the charge nurses are continuing their campaign of assigning heavy acuity, and larger numbers of patients to me than they are assigning to other nurses." The email did not contain any reference to age or race discrimination. P. Dep., D. Ex. 20, p. 000247-000248.

19.     On August 17, 2009, Branham again offered to meet with Hall. On August 18, 2009, Hall responded that she had been advised by counsel to not meet with KershawHealth representatives regarding the matter. P. Dep.; D. Ex. 20, p. 000247. In her deposition, Hall explained that by "counsel," she was not referring to an attorney, but to her husband. P. Dep. 141.

20.    Other than the three communications with Branham, Hall did not submit complaints to any KershawHealth supervisory employee or to anyone in the Human Resources office about her workload concerns.  P. Dep. 139, 144.

21.    Hall filed a Charge of Discrimination against KershawHealth with the Equal Employment Opportunity Commission ("EEOC") in August 2009.[4]  P. Dep. 32; D. Ex. 1.  The charge alleged age and race discrimination, but did not claim retaliation.  Hall alleged that Branham assigned more patients to her and Betty Anthony ("Anthony"), an African-American nurse, than she assigned to younger, white nurses.

22.    In May 2010, the EEOC terminated its investigation and issued a notice of right to sue upon Hall's request.  Defendants' Motion to Dismiss and for Summary Judgment, Attachment 1 (EEOC Notice).

23.    In early 2011, Hall submitted a letter to the EEOC, alleging retaliation.  P. Dep. 35, D. Ex. 2.  She complained that KershawHealth placed her on probation for unscheduled absences and had increased her hourly pay rate and the pay cap for her position, which deprived her of a yearly bonus.  Id., D. Ex. 2.[5]

### STANDARD FOR MOTION TO DISMISS

Under Fed.R.Civ.P. 12(b)(1), the plaintiff bears the burden of proving subject matter jurisdiction.  Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768

---

[4]The Charge is dated August 10, 2009 (prior to Hall's emails to Branham).  See P. Dep.; D. Ex. 1.

[5]In her deposition, Hall admitted she was actually absent on the days listed on her disciplinary notices.  P. Dep 85; D. Ex. 18.  Hall testified that she does not know of anyone who received a bonus that she did not receive.  P. Dep. 163.

(4th Cir. 1991). In determining whether it has jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Id. The motion to dismiss should be granted only if the "material jurisdictional facts are not in dispute" and the "moving party is entitled to prevail as a matter of law." Id.

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. Anderson, 477 U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The party

7

asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987); Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e)(1-4).

## **DISCUSSION**

Hall alleges that Defendants discriminated against her based on her age and race in violation of the ADEA, Title VII, and SCHAL, and retaliated against her in violation of Title VII and SCHAL. Defendant Branham argues that she is entitled to summary judgment because individual supervisory liability is barred under Title VII, the ADEA, and SCHAL. Defendant KershawHealth contends that Hall's claims under the ADEA should be dismissed because they are barred by the Eleventh Amendment to the United States Constitution, and alternatively that Hall's claims under the ADEA fail on the merits for the same reasons as her Title VII claims fail. KershawHealth argues that it is

entitled to summary judgment because: (1) Hall's discrete discrimination claims are procedurally barred, were abandoned by Hall in her deposition, and lack substantive merit; (2) Hall's hostile environment claims are not based on Hall's age or race; are not sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment; and are not imputable to KershawHealth; (3) Hall's retaliation claims have not been administratively exhausted, she cannot establish a prima facie case, and she cannot rebut KershawHealth's legitimate, non-retaliatory reason for its action; and (4) Hall's SCHAL claims are procedurally barred for lack of exhaustion and are substantively meritless for the same reasons that Hall's federal claims fail.

  A.  <u>Claims Against Branham</u>

    Defendant Branham argues that she is entitled to summary judgment because individual supervisory liability is barred under Title VII, the ADEA, and SCHAL. Hall argues that Branham is subject to supervisory liability.

  Hall cannot show that Branham is subject to individual supervisory liability under Title VII, the ADEA, or SCHAL. Under Title VII, supervisors are not liable in their individual capacities. <u>Lissau v. Southern Food Serv., Inc.</u>, 159 F.3d 177 (4th Cir. 1998)(holding that supervisors are not liable in their individual capacities for Title VII violations). The Fourth Circuit has stated that the language of the ADEA limits liability to "employers" and therefore prohibits individual liability against employees as agents of the employer. <u>Birbeck v. Marvel Lighting Corp.</u>, 30 F.3d 507, 510 (4th Cir.1994). SCHAL tracks Title VII jurisprudence. <u>Orr v. Clyburn</u>, 290 S.E.2d 804, 806 (S.C. 1982)("The South Carolina Human Affairs Law essentially follows the substantive structure of Title VII....Thus, Title VII cases which interpret provisions or procedures essentially identical to those of the Human Affairs Law are certainly persuasive if not controlling in construing the Human Affairs

Law.").  Thus, Hall cannot show that Branham is subject to individual supervisory liability under SCHAL.  See Allen-Plowden v. National Healthcare of Sumter, No. 3:07-420-JFA-BM,  2007 WL 3175165, at *3 (D.S.C. Oct. 26, 2007)("Individuals are...not liable...under the South Carolina Human Affairs Law.").

Hall argues, citing Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.  Here, however, Hall has not asserted a constitutional claim and has not shown the reasoning of Shaw, which involved claims under 42 U.S.C. § 1983, applies to this action.

Citing Paroline v. Unisys Corp. 879 F.2d 100 (4th Cir. 1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc) (adopting panel dissenting opinion), Hall also argues that an individual supervisor with certain delegated authority can qualify as an employer under Title VII. Id. at 104. She asserts that Lissau did not resolve or address Paroline's holding that an individual can be held personally liable if the supervisor exercises a significant control over the plaintiff's hiring, firing, or conditions of employment.  She further argues that Birbeck was not an absolute bar to suits against employees in their individual capacities.   In conclusion, Hall asserts:

> Based on Lissau's reliance on Birbeck, and Birbeck's reference to Paroline with approval, it would appear that a supervisor's discrimination based on gender would allow supervisory liability pursuant to Paroline v. Unisys Corp. [,] 900 F.2d 27 (4th Cir. 1990)(en banc), which has not been expressly overruled.

Plaintiff's Opp. Mem. at 7-8.  Even if the undersigned accepts this argument, it would not apply here, as Hall has not made a discrimination claim based on gender.  Further, even if Paroline has not been entirely overruled by Lissau, Hall fails to show that Branham exercised significant control over her hiring, firing, or conditions of employment such that Branham qualifies as an "employer" under the test in Paroline.  Finally, even if Hall could show that Branham is subject to individual

10

supervisory liability, Branham should be granted summary judgment for the reasons discussed below as to Hall's claims against KershawHealth.

B.    ADEA

Defendant KershawHealth argues that Hall's claims against it are barred by Eleventh Amendment immunity because it is an agent of the State for Eleventh Amendment purposes. Hall does not appear to dispute that KershawHealth is an agent of the State, but argues that Congress intended the ADEA to apply to the states.

In Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456 (4th Cir.1987), the Fourth Circuit outlined four factors[6] courts should consider in determining whether an entity is an arm of the state. Ram Ditta, 822 F.2d at 457. It should first be determined whether the State treasury will be responsible for paying any judgment that might be awarded. If the answer is yes, the inquiry is at an end because "if the 'State Treasury will be called upon to pay a judgment against a government entity ... consideration of any other factor becomes unnecessary' and the entity will be immune." Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002)(quoting Cash v. Granville County Bd. of Educ., 242 F.3d 219, 223 (4th Cir.2001)). Angela Nettles ("Nettles"), the Vice President of Human Resources and Support Services for KershawHealth, states that KershawHealth is insured by the South Carolina Insurance Reserve Fund, and the policy affords liability coverage,

---

[6]The factors of the test include, but are not limited to, the following: (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether it is involved with local versus statewide concerns; and (3) how it is treated as a matter of state law. Ram Ditta. at 457-58. Defendants have also provided that KershawHealth's Board was created by an Act of the South Carolina General Assembly, has functions and powers which are legislatively prescribed, and had its named changed through Acts of the General Assembly. See Defendants' Motion to Dismiss and for Summary Judgment, Attachments 2 and 3 (South Carolina Acts).

with a limit of $1,000,000, as to the discrimination claims set forth by Hall. Nettles Aff., Para. 10. The Insurance Reserve Fund pays claims and judgments from the accumulated reserve fund that is maintained by the State Budget and Control Board as a separate trust account of the State. S.C. Code Ann. § 10-7-130; see S.C. Code Ann. §§ 1-11-140(A)("The State Budget and Control Board, through the Office of Insurance Services, is authorized to provide insurance for the State, its departments, agencies, institutions, commissions, boards...."). If Hall prevails in this action, the State treasury will be called upon to pay a judgment in this case. Thus, the Eleventh Amendment protects KershawHealth against Hall's ADEA claim. See Hedberg v. Darlington County Disabilities & Special Needs Bd., No. 95-3049, 1997 WL 787164, at *2 (4th Cir. Dec. 4, 1997)(upholding Eleventh Amendment immunity where "any damages would affect the state of South Carolina's treasury"); Barr v. Williamsburg County, No. 2:06-3577-CMC-RSC, 2007 WL 666793, at *3 (D.S.C. Feb. 27, 2007)(recognizing Eleventh Amendment immunity where the defendant Sheriff was employed by a State agency and any damages would be paid by the South Carolina State Insurance Reserve Fund).

Accordingly, KershawHealth is immune from suit in federal court unless it waives its immunity or Congress abrogates its immunity. See Lapides v. Board of Regents, 535 U.S. 613 (2002)(noting that a State may waive sovereign immunity); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993)(stating that absent waiver of Eleventh Amendment immunity, "neither a State nor agencies acting under its control may be subject to suit in federal court") (quotations and citations omitted). Hall has not shown that KershawHealth waived its immunity or that it was abrogated by Congress. Hall, citing Arrritt v. Grisell, 567 F.2d 1267 (4th Cir. 1977), argues that Congress intended the ADEA to apply to the states. The United States Supreme Court, after Arritt, held that Congress did not exercise its power to abrogate a state's Eleventh

Amendment immunity in enacting the ADEA.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 91

(2000); see also E.E.O.C. v. Washington Suburban Sanitary Com'n, 631 F.3d 174, 179-80 (4th Cir.

2011 ("[T]he ADEA does not abrogate state sovereign immunity from private damages

suits....."(citing Kimel)).

        Even if KershawHealth is not an arm of the state, Hall's ADEA claims fail for the reasons

discussed as to her Title VII claims.  Further, "a plaintiff bringing a disparate-treatment claim

pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for'

cause of the challenged adverse employment action."  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167,

___, 129 S.Ct. 2343, 2352 (2009).  Hall has failed to do so.

        C.        Disparate Treatment/Discrete Acts

            Hall alleges that she has not been given the same employment, transfer, bonus and/or

advancement opportunities as white employees.  Complaint, Para. 9.  Defendants argue that they are

entitled to summary judgment because these claims (1) are procedurally barred; (2) were abandoned

by Hall in her deposition; and (3) lack substantive merit.  Hall appears to argue that these claims are

not procedurally barred because they are related to those asserted in her Charge and that the EEOC

should have reasonably investigated them.  She has not presented anything to rebut KershawHealth's

argument that these claims lack substantive merit.

        Hall failed to administratively exhaust these claims by presenting them to the EEOC or the

South Carolina Human Affairs Commission ("SCHAC").  "Only those discrimination claims stated

in the initial charge, those reasonably related to the original complaint, and those developed by

reasonable investigation of the original complaint may be maintained in a subsequent ... lawsuit."

Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)(discussing Title VII); see

also Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995) (If "the claims raised ... exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred."). Hall did not complain of the denial of any employment, transfer, bonus, and/or advancement opportunities in her Charge in which she alleged:

> I currently work for the above cited employer as a Staff Nurse since September 1999. In February ~~2009~~ 2008 Stacy Branham (age 20s/White) became my supervisor. Ms. Branham assigns Betty Anthony (Black) and I more patients than any of the other staff nurses (White/age 20-30s). This includes first patients. This impact causes a great deal of an increased workload and stress while the other employees have less assignments and patients.
>
> I complained to Stacy ~~Collier~~ Branham (White age 30s) but the reasons given were not viable. To my knowledge Ms. ~~Collier~~ Branham and the other white, younger nurses are close acquaintances which is one of the reasons why I believe I am being treated differently. In addition, approximately 7 young, white staff nurses were hired within the past 2 months to weed out the older nurses.
>
> I believe my employers actions are discriminatory because of my race/black and age/53 and of my interracial marriage. This was done in violation under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967, as amended.

Plaintiff's Opp. Mem., Ex. F (EEOC Charge). Further, there is no indication that the claims in Hall's Charge were reasonably related to the employment, transfer, bonus and/or advancement opportunity claims she raises or that they should have been developed by reasonable investigation.

Even if Hall's claims that she was denied a position, transfer, promotion, or bonus are properly before the Court, Hall fails to establish a prima facie case as to any of these claims.[7] She has not established a prima facie case concerning hiring, as she has not shown that KershawHealth

---

[7]To the extent that Hall brings a claim of discriminatory discharge by asserting that KershawHealth is weeding out older nurses and bringing in younger nurses (P. Dep. 148-149), she fails to establish a prima facie case as she has not been discharged by KershawHealth. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004)

had an open position for which she applied and for which she was rejected under circumstances giving rise to an inference of unlawful discrimination. See Mackey v. Shala, 360 F.3d 463, 468 (4th Cir. 2004). Hall admitted that she had not applied for any promotions, transfers, or positions other than the Baylor position that she received. P. Dep. 82-83. Hall has not shown that any similarly-situated employee received a bonus that she was denied, such that she cannot establish a prima facie case as to any bonus. See Woodward v. United Parcel Serv., Inc., 306 F.Supp.2d 567, 576 (D.S.C. 2004)(granting summary judgment to employer on discrimination claim where the plaintiff "failed to identify any comparators who are similarly situated with respect to pay"). Hall testified that she did not know whether any other employee received a bonus that she did not receive. P. Dep. 163.[8]

D.     Harassment/Hostile Work Environment

Hall alleges that she was subjected to a hostile work environment based on her age and race because she was given a higher patient load and she was given higher acuity patients than white nurses and younger nurses. Defendants contend that they are entitled to summary judgment as to Hall's hostile environment claims because Hall has not shown that the alleged harassment was based on her age or race, was severe or pervasive, and was imputable to KershawHealth. In her response, Hall argues that when she was given fewer patients, she was given high acuity patients such

_____

[8]Hall has not presented any argument in opposition to KershawHealth's assertion that she fails to establish a prima facie case as to any of these claims. Instead, she argues that she was assigned more patients and more patients with high acuity. Although these arguments appear to apply to her hostile environment claims, they simply do not show that she applied for a different job, transfer, or promotion and was rejected for such, or that she failed to receive a bonus that similarly-situated employees received.

For the first time, she appears to allege a disparate discipline case based on her being assigned more and higher acuity patients. Plaintiff's Mem. in Opp. at 12. Even if such a claim is properly before the court, she fails to identify what disciplinary measure was enforced against her that was more severe than those enforced against any similarly-situated employee. See Lightner v. City of Wilmington, 545 F.3d 260, 264-265 (4th Cir. 2008).

that her workload was heavier.  She argues that she has provided sufficient evidence of this based on her testimony, various nurse assignment sheets she has presented, and the testimony of her co-worker Anthony.

To prevail on a Title VII or ADEA hostile work environment claim based on race or age, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [race or age] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer."  Spicer v. Virginia Dep't of Corrs., 66 F.3d 705, 710 (4th Cir.1995) (en banc)(hostile work environment claims based on sex); Baqir v. Principi, 434 F.3d 733, 745-46 (4th Cir. 2006)(citing Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003))(hostile work environment claims based on age).

(1)     Based on race or age

Hall has offered no evidence that the alleged conduct was based on her race or age.  She has not pointed to anything to show that her age or race motivated the alleged hostile environment.  She claims that Branham, Collier, and Keefe were motivated by racial and age bias because they condoned the actions of the charge nurses.  See P. Dep. 162-163.  She has not, however, pointed to any evidence of race or age bias on the part of these individuals.  Personal animus is insufficient to support discrimination claims.  Hawkins v. PepsiCo, Inc., 203 F.3d 274, 282 (4th Cir. 2000)(citing Van Stan v. Fancy Colours & Co., 125 F.3d 563, 567 (7th Cir. 1997))("[P]ersonality conflicts and questioning of job performance are unavoidable aspects of employment.").

Hall appears to argue that her diary entries show that the alleged discrimination was based on her age and race.  Plaintiff's Opp. Mem. Ex., B.  This exhibit, however, is merely a list of persons

Hall believes were discriminated against. Although she does not identify the race of every nurse she believes was subjected to discrimination, seven of the thirteen nurses on the list are identified as "white." Plaintiff's Opp. Mem., Ex. B. If KershawHealth has allegedly discriminated against this many white nurses, this exhibit fails to show that Hall's race was the motivation for the alleged hostile environment.

              (2)    <u>Severe or Pervasive</u>

          Additionally, Hall has not shown that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment. In <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Faragher</u>, 524 U.S. at 787 (citing <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21-22(1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." <u>Harris</u>, 510 U.S. at 21.

          Hall appears to argue that the harassment was subjectively severe because she became physically stressed and ill based on her patient assignment levels. Even if she has met the subjective component, however, she fails to meet the objective one.

          Here, the alleged conduct does not rise to the level of being objectively severe or pervasive. Hall claims that younger, white nurses were given a lighter patient load. She states that one needs to look at the assignment sheets to determine how many patients nurses were assigned. P. Dep. 95;

17

see Anthony Dep. 78, 94.  She testified that she was not aware of any other source of information showing the number of patients assigned to nurses.  P. Dep. 91, 96.  Hall states that the assignment sheets also show the number of patient admissions.  P. Dep. 103.  Defendants have provided information, however, showing that numerous white nurses received the same or greater average patient assignments than Hall.

Collier states she has reviewed the patient assignment sheets for shifts when Hall worked. Whether the window of analysis should be from February through August 2009 (the period identified in Hall's Charge of Discrimination  - see P. Dep., D. Ex. 1) or from January 2008 through August 2010 (from the time Hall claims the discriminatory practices began until the filing of this action - see P. Dep. 46), there were numerous younger, white nurses who had patient assignment numbers that were the same or higher than that of Hall.  From February through August 2009, Hall received an average of 5.01 patient assignments per shift.  Seven white nurses had a higher average number of patient assignments than Hall: L. Halsall 5.04, R. Anderson 5.06, K. Anderson 5.08, B. Johnson 5.08, M. Syndor 5.11, J. Peavy 5.14, and B. Anders 5.17.  Every one of these nurses except K. Anderson is younger than Hall.  From January 2008 through 2010, Hall received an average of 5.07 patient assignments per shift.  A number of white nurses had the same or greater number of patient assignments: B. Johnson 5.07, B. Anders 5.07, A. Divers 5.09, G. Caesar 5.14, B. Cook 5.23, and C. Herring 5.26.  Every one of these nurses except B. Cook is younger than Hall.  See Collier Aff., Paras. 3, 5; Nettles Aff., Para. 7 (identifying the race of nurses and ages of some nurses).  Hall appears to argue that staff sheets she submitted with her opposition memorandum support her assertion that she was assigned more patients than younger, white nurses.  The staff sheets submitted are from one day in March 2009, one day in May 2009, and a number of days in each of June, July,

and August 2009. These sheets fail to rebut the information contained in Collier's affidavit. This submission does not cover the entire period of alleged discrimination, contain sporadic dates, and does not provide sufficient information to show that Hall was assigned more patients than younger, white nurses. A number of sheets submitted by Hall reveal that she was assigned less or the same number of patients as other nurses. Plaintiff's Opp. Mem., Ex. A.

In her memorandum in opposition to summary judgment, Hall argues that the times she was not assigned more patients, she was assigned higher acuity patients such that her workload was heavier than younger, white nurses. She argues that KershawHealth has presented nothing to dispute her testimony and that of Anthony that she was receiving unfair patient assignments. At her deposition, however, Hall was unable to identify a single patient in 2008, 2010, or 2011 who was more acute than those assigned to other nurses, and could only recall two patients in 2009 who were acute. P. Dep. 111-113. This fails to rise to the level of severe or pervasive. The conclusory statements from Hall that her patients were of higher acuity, and the statements from Anthony, however, fail to support Hall's claim. "Conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment." Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998); Gilliam v. South Carolina Dept. Of Juvenile Justice, 474 F.3d 134, 142 (4[h] Cir. 2007)("Although [the plaintiff] made several general statements of dissimilar treatment, she provided very few specifics. The few specific examples [the plaintiff] did proffer were not supported by any evidence other than her own statements, which often lacked detail.").

Additionally, Hall cannot demonstrate that her patients were higher acuity than those of other nurses as she did not have complete information about the acuity level of patients assigned to other nurses. She testified that her job responsibilities do not include assessing the acuity of patients not

assigned to her.  P. Dep. 90.  While Hall claims she hears about acuity levels of other patients during report (the patient summaries exchanged by nurses during shift changes), she acknowledges she may not be present for the full report, the report is not a complete picture because patient acuity may change over time, and a nurse has to assess a patient to get a true sense of the patient's acuity.  P. Dep. 70, 114-115, 124.  Anthony admitted that once the report was over, unless a nurse is the one treating the patient, the nurse does not know the condition of the patient.  Anthony Dep. 77.

     E.      <u>Retaliation</u>

     Hall alleges that Defendants retaliated against her, in violation of Title VII, because she complained of discrimination based on race and age.[9]  She testified that in July 2007, she stood up for June Bock, a white co-worker whom KershawHealth had discharged, by sending a letter to Keefe.  P. Dep. 49, 148, 150; D. Ex. 23.  She alleges that because of her defense of Bock, KershawHealth retaliated against her by taking away her Baylor shift and because charge nurses assigned her a heavier work load.  Tr. 151.  Defendants argue that Hall's retaliation claim fails because she has not exhausted it as she did not include it in her Charge which was filed more than two years after the alleged protected conduct.  They further argue that even if she exhausted her retaliation claim, she fails to establish a prima facie case of retaliation, and it has presented a legitimate, non-retaliatory reason for removing Hall from the Baylor schedule.  Hall argues that her retaliation claims are like or related to those raised in her Charge and thus are not procedurally barred.  She argues that she has established a prima facie case of retaliation because she was assigned more patients with higher acuity than were assigned to younger white nurses.

_____

     [9]It is unclear whether Hall is asserting retaliation under the ADEA, but any ADEA claim fails for the same reasons as discussed below.

Ordinarily, retaliation claims must be administratively exhausted before they can be litigated in federal court.  Miles v. Dell, Inc., 429 F.3d 480, 491-492 (4th Cir. 2005); Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 132-133, (4th Cir. 2002).  The alleged protected action (the July 2007 letter to Keefe) occurred more than two years prior to Hall's filing her charge of discrimination with the EEOC.  In the Charge she made no mention of any retaliation claims.  See P. Dep., D. Ex. 1 (EEOC Charge).

Even if Hall's claim is properly before the Court, she fails to establish a prima facie case of retaliation.  To establish a prima facie case of retaliation under Title VII, an employee must demonstrate that:

    1)       the employee engaged in protected activity;[10]

    2)       the employer took some adverse employment action against the employee; and

    3)       a causal connection existed between the protected activity and the adverse action.

See Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998)(ADEA and Title VII); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994)(Title VII).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual.  Reeves, 530 U.S. at 147 (2000).

---

[10]Under Title VII, a plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity.  Warren v. Halstead Indus., Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988); Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

Hall fails to show that her email to Keefe constitutes engagement in a protected activity.  In her email, Hall complains about excess paperwork and other practices nurses have to carry out and includes a brief discussion about the termination of Bock, but makes no reference to race or age discrimination.  P. Dep., D. Ex. 23.  Concerning Bock's firing, Hall complained that "it is not practical to expect nurses with all they have to do on a day to day basis, to have all 'i's' [dotted], all 't's crossed and be out on time," and "[n]urses are expected to be advocates for their patients, then why is a nurse fired for being just that."  Id. D. Ex. 23, p. 01911.  As Hall did not engage in a protected activity, her prima facie case of retaliation fails as a matter of law. See Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1008 (7th Cir. 2000)("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints."); Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3rd Cir. 1995)("[The plaintiff's] letter is just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA....A general complaint of unfair  treatment does not translate into a charge of illegal age discrimination.")(emphasis in original); see also Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 191 (dismissing the plaintiff's retaliation claim where "the complaint [did] not explain why [the plaintiff's] investigation would be considered protected activity."), cert. granted, 131 S.Ct. 3059 (2011).

Hall also fails to establish that she was subjected to an adverse employment action as to her claims of harassment.  As discussed above, she fails to show that she was subjected to a hostile environment by being given a heavier workload.

22

Additionally, Hall fails to show a causal connection between the protected activity and the adverse employment action. First, she cannot show a causal connection because she has not shown that those who allegedly took the adverse actions against her (the charge nurses and Branham) knew about the email to Keefe. See Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Branham states she did not learn about the email until more than two years later, when Hall filed her EEOC Charge. See Branham Dep. 59. Second, Hall cannot show a causal connection based on temporal proximity alone. She claims that the alleged hostile environment began approximately nineteen months (in February 2009 - see P. Dep., Ex. 1) after she made her complaint regarding Bock (July 2007). See, e.g., Pascual v. Lowe's Home Ctrs., Inc., No. 05-1847, 2006 WL 2226571 (4th Cir. Aug. 2, 2006)(holding that three to four months between the termination and protected activities is too long to establish a causal connection by temporal proximity alone); Shields v. Federal Express Corp., No. 03-2103, 2005 WL 102990 (4th Cir. Jan. 19, 2005)(three to four months was insufficient to raise an inference); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001)("A six month lag is sufficient to negate any inference of causation."); Garrett v. Lujan, 799 F. Supp. 198, 202 (D.D.C.1992)(concluding that the passage of nearly a year precluded an inference of causal connection); Parrott v. Cheney, 748 F. Supp. 312 (D.Md.1989)(even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context), aff'd per curiam, 914 F.2d 248 (4th Cir. 1990).

Even if Hall can establish a prima facie case of retaliation as to her removal from the Baylor schedule, KershawHealth has articulated a legitimate, non-discriminatory reason for its actions, that Hall missed the weekend shifts she was scheduled to work. Hall fails to show that this reason is false or pretext for discrimination.

23

F.     SCHAL

Defendants argue that Hall's claims under SCHAL are procedurally barred for lack of exhaustion and substantively meritless for the same reasons that her federal claims fail.  In her opposition memorandum, Hall has not addressed these claims.

A prerequisite to filing suit under SCHAL is exhaustion of remedies before SCHAC.  See Settles v. Pinkerton, Inc., 482 F. Supp. 461, 465 (D.S.C. 1979)(dismissing the plaintiff's claim because he "was required to exhaust [the] state remedy" before SCHAC).  SCHAL provides:

> Any person shall complain in writing under oath or affirmation to the Commission within one hundred eighty days after the alleged discriminatory practice occurred..... The Commission shall serve a copy of the complaint upon the respondent within ten days after the complaint is received by the Commission....

S.C. Code Ann. § 1-13-90(a); see Grooms v. Mobay Chem. Corp., 861 F. Supp. 497, 501-502 (D.S.C. 1991)("Section 1-13-90(a) requires that all charges be filed with SHAC within 180 days after the alleged discriminatory practice occurs.").  Under SCHAL, "'Commission' means the State Human Affairs Commission."  S.C. Code Ann. § 1-13-30(a).  Hall testified that she never filed a complaint (charge) with SCHAC.  P. Dep. 34.  Further, there is no evidence that EEOC filed Hall's charge with SCHAC. See id. at 34-35.

Even if Hall's SCHAL claims are not procedurally barred, summary judgment should be granted to Defendants.  As noted above, analysis of SCHAL claims follow those under Title VII. Orr, 290 S.E.2d at 806.  As Hall has not established her claims under Title VII (or the ADEA), she cannot establish them under SCHAL.   Additionally, Hall appears to have abandoned these claims as she has not addressed them in her response to Defendants' motion to dismiss and for summary judgment.

24

## CONCLUSION

Based on the foregoing, it is recommended that Defendants' motion to dismiss and for summary judgment (Doc. 22) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

February 3, 2012
Columbia, South Carolina